Case of the morning, number 2420439, Carbo Ceramics v. Tax Assessors for Wilkinson County, Georgia. May it please the Court, Mr. Smith. Thank you, ma'am. Kendrick Smith for the appellant, Carbo Ceramics. This case came to the bankruptcy court as a consolidated property tax appeal filed under Georgia law for years 2018 through 22. And if you look at any of the pleadings or particularly the joint pretrial statement that makes it very clear, that's all it was. How come we don't have the bankruptcy court's ruling in our record? You should, Your Honor. I believe it is in the record. It certainly — I cited to it in the brief. Well, he had a lengthy — well, we were looking at — he had a lengthy oral ruling as well, didn't he? He issued several memoranda of law, and then he issued a final judgment. And those — I believe they are in the record. And those are what we are appealing here. Well, I'm well aware of that. Okay. Well — Some — there was no transcript of some things that were significant. So anyway. The transcript is the trial transcript, which, of course, was interrupted. He halted it in the middle of the hearing. It was set as a two-day trial. The only issue for the judge to address was to determine the fair market values of the machinery and equipment that Carbo maintains down in Wilkinson County, Georgia. And when the trial began, three key issues had already been resolved by a settlement agreement. One, there was force majeure. It existed. The demand for the product that Carbo manufactured permanently dissipated in 2015 and continues to this day. Number two, as a result, the machinery and equipment was up to 90 percent idle because this force majeure event occurred. And number three, because of this inutility, there's economic obsolescence that does reduce the fair market value of the equipment. This is all reflected in a 2017 settlement agreement, which is of the record, which states — and this is stipulated in the agreement — Carbo has experienced a force majeure event outside of its control, which forced it to postpone planned expansion, cut back on its production, lay off its employees, and mothball a portion of its equipment. The agreement allowed Carbo to claim substantial inutility penalties for years 15, 16, and 17. And thereafter, the assessors committed to assess and value the equipment solely at fair market value, which is a fine term under Georgia law that incorporates the concept of economic obsolescence. After the settlement agreement, the assessors disallowed all economic obsolescence. The dispute came finally to the bankruptcy court, because Carbo had to file bankruptcy, and the parties submitted, just prior to trial, a joint pretrial statement setting out the issues, the authorities, and the stipulated facts. Let me ask you just a practical bankruptcy question. Um, the judgment is entered against a company that I assume is going into liquidation? Is it still in — it's not still in Chapter 11, right? It came out of Chapter 11. Came out of Chapter — it exists? One of the creditors bought it, and it exists. So the tax liability would be against the purchaser or against the whatever's left of the debtor? Well, the issue before the court is from 2018 to 2022, when it was Carbo Ceramics, and that is the issue that's before it. Well, I mean, is there — does it make any practical difference? Is there anybody against whom a judgment can be collected? Yes, there is. And there's hundreds of millions of dollars of cost machinery down there that, of course, has no real market value at this time. The core mistake that the court made, it didn't make any findings of value. Notwithstanding, that was the one thing it was asked to do. It deemed all value evidence, which Carbo presented, an expert who testified as to what the fair market value was, the end-utility penalties, the assessors did not present anyone to contradict that. That's the only evidence of record. The court deemed it irrelevant. And its core mistake — it made a lot of mistakes, but this is the core mistake — it concluded that the 2008 MOU provides for a valuation method which excludes the consideration of additional depreciation in the form of end-utility and economic obsolescence, a position the assessors never asserted. The court clearly came to this conclusion before the trial began, because at the outset, he canceled the second day without explanation. During or throughout whatever — the one day of trial that we had, he attempted to solicit testimony and admissions from the assessors to back up that conclusion, and they did not. He was asking during the opening by the assessors, did the MOU's valuation methodology different from Georgia law? The response, methodology of valuing property does not necessarily change. The judge pressed, but if there is an inconsistency, which one controls? And the response, I would say the statute controls over an agreement unless there's a provision in the statute that says otherwise, but for purposes of this, I don't think it's a distinction that has significance. There's no difference between — bankruptcy Judge Isker indicates that they did make the argument that, to some degree, Judge Isker adopted. As I understand it, he ruled that depreciation could include or take into account end-utility and economic obsolescence unless it was expressly excluded by the contractual provision, right? 8 — what, 8.4.B. And then he says there was that expressed exclusion through the reference to the 24-hour period, running the machinery for 24 hours a day. Do you agree that the parties could expressly exclude the consideration of end-utility and economic obsolescence for purposes of depreciation? It would have to be explicit, but yes, of course, parties can agree to a different valuation method. Right. And then the bankruptcy judge says the stipulation that the property would be operated on a continuous 24-hour-per-day basis is precisely such an expressed exclusion. Why do — what's the disagreement with that conclusion? That to me is the crux. Let's look at it. Let's turn — I have your — I gave each of you some submissions. Let's look at the MOU provision. It's the orange tab. And there's only one paragraph in the entire MOU that deals with valuation, and it's listed here. Machinery and equipment — the parties here to acknowledge that the machinery and equipment falls in Economic Life Group 3, as defined in the applicable Department of Revenue Rules and Regulations, which is the appraisal procedures manual that the parties stipulated govern this case, shall be operated on a continuous 24-hour-per-day basis and shall be valued for ad valorem tax purposes. It costs less depreciation. Depreciation shall be calculated — shall be calculated based on Department of Revenue Regulations, which explicitly incorporate and contemplate economic obsolescence, physical deterioration, all these additional depreciations. The descriptor of operating 24 hours a day is the type of equipment that falls in Economic Life Group 3. It's heavy machinery designed to operate continuously. It is not a — Your construction of that phrase is that it is simply supporting the classification of the machinery and equipment in Category 3. Precisely. It's certainly not a requirement that the machinery be operated 24 hours a day. And it certainly isn't explicit, since the only thing explicit is that it shall be calculated best and — based on Department of Revenue Regulations. And now, the language in 4A — 4B, sorry, is what you've just read. 4A, which concerns real property, says fee-simple interest in real property shall be valued for ad valorem tax purposes at fair market value on the same basis as other real property in the county. Yes. Seems pretty straightforward. If what the parties intended through the contract was simply the normal procedure, why didn't they use the language in 4A — or in 4B, similar to 4A? No question about what that means. Why the special language in 4B, other than the parties wanted a fixed depreciation schedule with no adjustments? Well, because the — how it's worded here is it's to incorporate expressly the Appraisal Procedures Manual, which has its own provisions for personal property that are different from real property. And they wanted to make it clear that for purposes of calculating depreciation, it shall be based on Department of Revenue requirements. And if you'll look at — I'll have you now turn to the blue tab, which are excerpts from the pretrial order, the joint pretrial order. Down at number 7, of course, it's Georgia law, so we're giving the judge what the applicable Georgia law is, and it says, under Georgia law — this is an agreed applicable proposition — county boards of tax assessors shall require their appraisal staffs to follow the procedures set out in the Georgia Appraisal Procedures Manual, Joint Exhibit 1, when assessing ad valorem tax on personal property. Now, let me address this 24-hour-a-day thing. Not only is it not explicitly a forfeiture of the right to additional depreciation, it's quite impossible, because machinery, it may be designed to run continuously, but you have to shut it down for maintenance, you have to shut it down for repairs, you have to shut it down if occasionally something breaks, or you shut it down for force majeure. In this case, it was the dissipation of the property, but force majeure could be a meteor coming in and destroying the plant. Normally I don't — normally, in common law, I don't think force majeure applies to the ascendants of the economic cycle, but the parties agreed this was force majeure. They did agree to it, and the person who drafted it, who was the only witness who testified on behalf of the county, Kevin Brown — I'll quote it — well, he said three things. One, he said, no dispute that the force majeure event occurred in 2015 and remains in effect to this day, which was — that was back in 2022. The MOU contains nothing to suggest that Carbo can't claim economic obsolescence, and the provision, the force majeure provision that he drafted in the MOU covers obsolescence or damage or destruction of things like that, and those are part of the APM. But that — the force majeure provision is within the section of the contract dealing with the job creation? It does. Right, and so why the section 8, which concerns evaluation, that doesn't contain a force majeure provision. The MOU only has two affirmative obligations for Carbo — invest money in the county, which it did, and maintain a level of employment, which it did until the force majeure. And the only penalty, if it didn't do it, is the county could claw back some of the Why the parties came to the settlement agreement nine years after the MOU is we now have force majeure. This is something no one anticipated. How are we going to deal with that? And they came to a settlement agreement, which explicitly said all the property going forward will be valued at fair market value, which is a statutory term drafted by their attorney that includes, by definition, economic obsolescence. So the matter should have been governed under the 2017 settlement agreement. There isn't anything inconsistent. The MOU, as you see, says you have to follow the appraisal procedures manual, but the settlement agreement is now that we have this force majeure, how do we deal with it? And they agreed, specifically incorporated the fair market value definition into how to go forward, and they didn't follow it. The evidence that was presented by Carbo at trial was what the value would be had it been valued at fair market value, which would have resulted in a $2.6 million refund to Carbo. But by the judge fabricating, quite frankly, this obligation to continuously operate this machine no matter what, and we don't know where he came up with the judgment amount, but it became a $7 million swing. There was no claim in the pretrial order for payments in lieu of taxes. All the claims were for taxes. There was no claim for liquidated interest. That's something that they never raised. But the court fabricated this obligation and made it unconditional and then imposed a number against Carbo that bears no relation to the record on claims that were never asserted. And this is why we're here seeking to get that rectified. They also, as we've noted, some due process issues. There's ish problems with, they asked for $1.7 million and the court gave them $3.4 million. What relief do you seek since your time is up? It is. What relief do you seek? Unfortunately, they didn't finish the trial. So I think the only relief is we vacate the erroneous memoranda of law. We have to send it back, let us finish our trial, and. To decide what? The original point, the fair market values of the machinery and equipment for those years. Okay. And we also have an attorney's fees claim, too. Right. Which the court allowed. All right. Thank you. All right, you have time for rebuttal. All right, Mr. Jones, Ms. Jones. Good morning, your honors. May it please the court. My name is Haley Jones and I represent the Appellees, the Board of Tax Assessors, and the people of Wilkinson County, Georgia. Judge Jones, I want to begin by answering a question that you posed to my friend on the other side at the outset of his argument. And you asked, where in the record are Judge Isger's ultimate rulings? His memorandum opinion, is that page 6298? No, we've got that in the record excerpts. There was a trend, at one point he entered a final judgment that states for the reasons set forth on the record at the September 20 hearing, final judgment is hereby entered. He ruled on a dispositive question, your honor. And he posed that question in the trial, on the transcript, on the record. And that question was, is CARBO allowed to claim additional depreciation in the form of economic and functional obsolescence? And what he said is, if the answer to that question is no, I don't know why we're here. And so the parties briefed it, and he determined the answer to that question was no, and so then entered a final judgment using simple math. So, okay, we do not have a transcript of that hearing. That's right, your honor. You don't have a conclusion of the trial, and CARBO uses that to claim that there's been some due process violation, and there has not been. They were fully heard on the dispositive question that was well within the scope of the party's joint pretrial statement. The joint pretrial statement is contained in the record, and at page 6452, it contains four contested issues of fact. Those contested, the first three contested issues of fact ask for the amount of functional obsolescence that CARBO was entitled to claim, quote, if any, and the amount of the economic obsolescence that CARBO was entitled to claim, quote, if any. That suggests that the answer to those questions is that CARBO may not claim any. The answer is zero, and so the entire . . . But those were fact, contested fact issues? They were identified as contested fact issues, yes, your honor, because if the answer to the question was CARBO is allowed to claim some additional depreciation . . . Well, I understand that, but if any, normally, all right, we can debate whether that's ambiguous. Whether it's a question of law or fact. Was it a, right? Right, your honor. Ms. Jones, sorry, after the party submitted those briefs, was there a hearing on the issue, or did he rule simply on the briefs? He ruled simply on the briefs, which is within his discretion as a bankruptcy judge, and it was a ruling on a dispositive issue. And so, Judge Rodriguez, I'd actually like to address some of the questions that you asked my friend on the other side. You asked if the 24-hour continuous operation language is a valuation stipulation, an express valuation stipulation, which is what Judge Isker found. He got it right, and it is, and it cannot be anything else, because it's not a covenant. We know that. As my friend on the other side has said, the equipment and machinery cannot possibly be operated 24 hours a day. At times, it has to go down for maintenance. And so, what then does the provision mean? Of course, there's no consequence stated for breaching that provision, unlike with respect to the jobs shortfall. If there's a job shortfall, the county is entitled to a remedy for that. There's no remedy stated in the agreement for the equipment and machinery not being operated 24 hours a day. So, Judge Isker looked at that, and he said it must be, then, a valuation stipulation, and that is supported by the fact that it appears in a section under a heading entitled valuation and other matters. Do you agree with his statement that absent an express exclusion of inutility and economic obsolescence for purposes of depreciation that CARBO could benefit from those? Yes, Your Honor. And then he concluded that that express exclusion was the subsequent language about the 24 hours per day. You know, how is that an express exclusion to exclude economic obsolescence and inutility? It is an express, and I'll say this first. It could be more clear, Your Honor, and we can see that he could have said, CARBO may never claim additional depreciation for economic or functional obsolescence ever. Well, it's not here. I mean, this is the contract. How is that language in the contract an express exclusion of economic obsolescence and inutility? It's an exclusion based on its context. It appears in a section related to valuation. It appears in a section regarding ad valorem tax relief. It doesn't appear in a different context of the agreement where it's a covenant about operation. And what follows, then, is the language that the appellant relies on, which is that depreciation shall be calculated pursuant to the Georgia Department of Revenue regulations. And you can square those two provisions and read them in harmony. The reason is those regulations, the Georgia Appraisal Procedures Manual, does allow for some depreciation, and we acknowledge that. It is the Economic Life Group 3 fixed schedule of depreciation. The parties agree that that depreciation applies. It has always been applied to assess Carbo's property in this case. It was agreed upon, as the trial record reflects. Mr. Smith made that comment in his opening statement, that the parties agreed on the fixed depreciation schedule. So the reference to the external Georgia Appraisal Procedures Manual is a reference to a fixed depreciation schedule. And Mr. Brown, who was the drafter of these documents, explained this in the court below. He explained that is a reference to a fixed schedule, and that schedule is certain. What the parties did not intend was to infuse uncertainty into this relationship by allowing for variable annually functional and economic obsolescence. And that would not have been approved, likely, by the Georgia Superior Court, that would have to approve- Your best case in Georgia law. Well, Your Honor, for the proposition that the Georgia court has to approve this particular transaction, it's a case involving Rivian, for the proposition that there was no modification of the contract. It's a case, it's the Rydland case, the Ryder case, cited in our- No, but I mean for your, is there any way, anything under Georgia law that wouldn't help us interpret your argument that this is an exclusion? Your Honor, it's Georgia Code 13-2-3. And what that provision says is simply that this court applies the plain and unambiguous language of the agreement, and that all that need be stated is a, quote, sufficient expression of the partisan- Well, how, how? I mean, that was, these were not contested issues of law in your pre-trial statement. They were not contested issues of law because- Did you brief any of this in your pre-trial? We did not because Judge Isker did not ask for that brief. That's because he, but again, if they're not issues as far as the parties see them, I, I, Judge Isker's a very smart guy, but that implies that the parties didn't see those as issues. Your Honor, two responses. First, the parties did. Mr. Crawford raised in his opening statement this 24-hour per day continuous operation language, and the pre-trial order poses a single question. What is the amount of additional depreciation that Carbo may claim for economic and functional- And what did your side respond? We submitted that there was a chance that the answer to that question was zero, if any. Yes, but that was because you were arguing over the fact. Because you stipulated, this is a dispute over the amount of tax, you stipulated, uh, that the assessors assess the properties based on, uh, economic life classifications from 2018 to 22, and you stipulated that the APM established the procedures. And it does, Your Honor. That, that is all true. The APM does establish the procedures, specifically the fixed depreciation schedule that we acknowledge governs some of the depreciation analysis. We acknowledge that. And so, yes, Your Honor, we did stipulate to certain facts regarding valuation, and there is valuation work to be done here. The question is whether there may be a claim of additional functional and economic obsolescence, and the answer to that question is no, and was, if the answer to the question of how much depreciation, additional depreciation- If the equipment sits idle for four years, as it had been, right, it had been pretty much idle for several years before Chapter 11? Uh, mostly, Your Honor. One of the lines at the Toombsboro manufacturing plant was reconfigured to make alternative products, and that's in the trial record. Yeah, but, I mean, the background to this, as I understand it, is that when fracking took off in the West Texas market, these little plastic globes, whatever, that Carbo makes were suddenly much more expensive and, therefore, cost prohibitive for the producers, right? That's, that's correct, Your Honor. And you defined that as force majeure? No, we did not, because the force majeure provision in the agreement applies only to the jobs goal, and Kevin Brown's testimony on that point is very clear. He confirms that the force majeure provision is contained in Section 8.5 of the agreement. What it says, it appears in a, under a heading entitled, Job Goals for the Project. The text of that provision of the 2008 MOU says in Section 8.6c that the, quote, jobs goal in any year is subject to the effect of a force majeure, the jobs goal. Force majeure is defined to mean, quote, any unexpected event which prevents Carbo from meeting the applicable jobs goal. And the effect of the force majeure shall be that, quote, the applicable jobs goal for such years shall be reduced by the number of jobs that Carbo shall demonstrate were not fulfilled as a result of such force majeure. The agreement limits the effect of a force majeure event to the jobs goal only. And in fact, there are shortfall payments due to the county if that goal is not met. Now, Mr. Smith's argument today has been that the 2017 agreement somehow modified that definition and it did not. Georgia law, the Ryder case, requires the parties manifest an intent to modify their agreement. They— Ms. Jones, does the record contain information or any indication that at some point during the life of the MOU, Carbo requested additional depreciations based on inutility and received them? Yes, Your Honor. That argument began in 2015, and it was the subject of the 2017 settlement agreement that covered tax years 2015, 2016, and 2017. So the only time the assessor accepted that form of depreciation was in connection with the settlement agreement? That's right, Your Honor. And that fact fits in in a couple ways. There's been a modification argument that the parties modified the 2008 MOU, and the MOU says that all parties to the MOU must sign any modification in Section 10H. There are important parties, particularly the development authority, missing from the 2017 settlement agreement such that the parties cannot, under Georgia law, have manifested an intent to modify the 2008 MOU. So Section 8.4 is still in effect. There has been no modification. Now, in their reply for the first time, the appellant makes a waiver argument. The waiver argument is waived because it's raised for the first time in a reply under this Court's precedent of Hernandez v. United States. That's the most recent recitation of the principle that an argument raised for the first time in reply is waived. But if the Court reaches the merits of the waiver argument, Georgia law requires that there be no other explanation besides waiver. That's in O'Shea v. Coldwater Creek, and it's not cited in our brief. I'm not sure we use principles of waiver in federal court, state court waiver in federal court. Well, Georgia law governs the parties' contractual relationship pursuant to a choice of law provision, and so whether the parties waive their contractual rights would likely be governed by Georgia law. And so the O'Shea case is helpful on that proposition. It's at 888 F. 3rd, 219, decided in 2019 by the Georgia Court of Appeals. And what that case says is if there's any other explanation for the conduct, there can be no waiver. Here there is an explanation for the conduct, which is a county with 30,000 households of 8,500 people whose mean income is $22,000 annually tried to settle this dispute so that we wouldn't end up exactly where we are today. That's what happened in 2017. Jones, you referenced, turning back to the contractual construction issue, evidence that what the parties intended through this language was to establish a true fixed schedule of depreciation, obtain certainty so both sides understood what was going to happen. That's extrinsic evidence. Do we even consider it unless there's an ambiguity, and do you agree that the provision is ambiguous? We contend it is not ambiguous, and so the court does not need to visit Kevin Brown's testimony on that point unless it disagrees with Judge Osgurt and finds the language ambiguous. How is it not . . . if it has to be an express exclusion to get the result that the assessor is arguing for, at the very least, it would have to be . . . I mean, it's clearly not an express exclusion unless you read into it some form of industrial understanding or within the meaning of taxation, valuation, that everybody would have understood that this meant you exclude economic obsolescence and inutility. Don't you need it to be at least ambiguous to allow for this extrinsic evidence to come in? It's not ambiguous, Your Honor, because that language, it does have a specific meaning in this context. It has to be read in its context, which is a principle from reading the law that this court applies. It has to be read in its context, and so it appears in a provision entitled Valuation Methods, and it is the first introduction of the Georgia Appraisal Procedure Manual. I'll try it this way. The Georgia Appraisal Procedure Manual supplies the formula, and that's what the parties incorporate into their agreement, is this formula, which is basic cost, less depreciation. There's a fixed depreciation schedule, and then there's this additional depreciation that Carbo is claiming that is functional and economic obsolescence. And so the question, once we know what the formula is, is what depreciation is allowed? And the 24-hour per day continuous operation language can only be a valuation stipulation that additional depreciation may not be claimed, and that is because of the context in which it appears, and it's also because of what the Georgia Appraisal Procedure Manual says. Mr. Smith said that the Economic Life Group 3 classification relates to the 24-hour per day operation requirement or language, and he said that they are related based on how the procedure manual defines Economic Life Group 3 assets. All that that definition says is that Group 3, the appraisal staff shall place into Group 3 any assets that have a typical economic life of 13 years or more. It does not say in this definition anything about 24-hour per day continuous operation. And so the only meaning that this Court can give to that language, again, because it's not a covenant with a consequence for breaching it, it's not a covenant with a consequence for Carbo not operating 24 hours per day, the only meaning the Court can give to that language is if it is a valuation stipulation, which makes sense in light of where it occurs in the agreement. Now, do we concede that it— Not because of what it says. I'll concede that, Judge Graves. Yeah, I'll concede that. It certainly doesn't say in the clearest terms that it could, Carbo shall never claim additional depreciation for functional or economic obsolescence. But again, I would point the Court to Georgia Code 13.2-3, which simply requires a, quote, sufficient expression of the party's intent, and we contend this is sufficient. And if, Judge Rodriguez, the agreement is ambiguous, if the Court decides that the agreement is ambiguous, Kevin Brown's testimony says that the intent of this provision was to create certainty, certainty for the parties, certainty for the county as to what the result would be of the depreciation schedule. And certainty can only be achieved if the parties know what depreciation Carbo can claim based on an elapsing of time. So that's our interpretation of the agreement, Your Honor. I do want to address more thoroughly than I have paragraph 9 of the 2017 settlement agreement. It does contain a reference to, quote, fair market value. Judge Isker found that that language can only be read as an acknowledgment by the parties that they were deviating from what the MOU otherwise required. And then the next sentence of that paragraph 9 is important, and what it says is that nothing in this agreement shall prohibit the parties as of January 1, 2018, from taxing or evaluating the property on a go-forward basis. So nothing about that agreement limited the taxation on a go-forward basis. Finally, I do want to address the judgment amount. My friend on the other side has argued that there was no evidence in support of the judgment amount that Judge Isker entered. And this is in his order denying reconsideration. He explains his math, and Carbo said in opening statement below that the amount of tax owed is simple math. We've both taken that position in this lawsuit. So what Judge Isker did is he explains in his opinion denying reconsideration is that he took the assessed tax, the tax that the county said that Carbo owes, and he found that number based on Carbo's returns, which were Exhibit 18. He found that number based on the tax invoices sent to Carbo, which were contained in Exhibits 18 and 21D. And then he looked at Exhibit 24 and 24A. You know, that's a real stretch when the parties never disputed any of that at trial, right? Even if he were right on the law, at the very least, the amount of the judgment would have to be sent back, would it not? No, Your Honor, not where it is simple math. There's no evidence in the record. Well, I'll bet you they would say it's not simple math. They certainly say that, Your Honor, but just because they say it does not make it so. It is math. What is the amount of what the assessor has assessed? What is the amount of tax that Carbo has paid? And what is the delta? And those are the numbers that Judge Isker used to reach this point. He used those three numbers, which were not, or two numbers, rather. It's simple subtraction, and those two numbers are not disputed. There is only— How come he ends up with a judgment that's, what, at least twice what the assessors sought? Well, you're probably referencing a chart in Exhibit 24. Well, originally, no. My understanding was that originally the Carbo thought it should have a million-some return to it, and the assessors thought that Carbo should pay 2-point-some million. And he— Right. Yes. So the discrepancy, Your Honor, is the quantum of depreciation versus the fact of additional depreciation. And we were prepared to argue, if Judge Isker found that some additional depreciation was allowed, that Carbo's numbers were too high. And so the $1.7 million number—Your Honor, I see my time is elapsed. May I briefly— Go ahead and answer. Sure. The $1.7 million number that is contained in Trial Exhibit 24 is a reflection of the value that the county was prepared to offer if obsolescence was allowed. But the position was always that obsolescence—functional and economic obsolescence—should not be the basis for additional depreciation. And that's because of if any? Yes, Your Honor, that's right. Not briefed before trial. Not briefed before trial because it wasn't requested, Your Honor. And so—and this Court has never, by the way, read a joint pretrial statement so narrowly as to exclude a claim based on the— A fact issue conditioned, if any, to not exclude a legal issue that the parties didn't raise. I don't think that—if we were to do that, I don't think that would be a narrow construction. Well, because I'm out of time, Your Honor, I'll say that—  Respectfully, we disagree. And a good case on that is Hall v. State Farm, where the question was whether a wife had burned down their home, depriving the parties of their insurance coverage, their homeowners insurance coverage. That was the issue presented in the joint pretrial statement. At trial, the Court found that the husband had actually burned down the home. And the singular issue driving the case was whether there was insurance coverage. Because facts came out at trial that answered the question, it was all deemed to be within the context—within the four corners of the joint pretrial statement. So we would submit the same rationale here. The singular question driving this case was—there was one. What is the amount of additional depreciation CARBO may claim? An answer of zero. We've got your argument on that. Thank you. Thank you, Your Honor. All right. Thank you very much. Mr. Smith. First, you will note that there was no statement or argument as to why the fair market value provision of the settlement agreement should not have applied to the trial. What you heard was arguments—I think in the brief they make like five of them—saying, well, it's a nullity. We shouldn't be bound by it because someone didn't sign off on it. All I can say is the Court heard all of these arguments and rejected all of them. The Court specifically said the settlement agreement is binding on the assessors. That's at page 6393 of the record. So it's binding, and the question is, why doesn't the fair market value—why were they not obligated to value at fair market value? Now, Judge Rodriguez, you did focus on—in the MOU, there is no explicit forfeiture of economic obsolescence or physical deterioration or any of the additional depreciations that are allowed under the APM. What has been stated here is, well, the Court inferred it. It implied it based upon his review of the whole thing. This is—and it's not just Georgia, but we do cite extensively—you can't infer a forfeiture. It has to be explicit. It has to be not only explicitly worded, but you have to show that both sides understood that there was a forfeiture that they agreed to. There was no testimony at trial by anyone. There was no suggestion at trial that there was a forfeiture of the right to claim economic obsolescence. Isn't your read, though, of that provision effectively render the continuous 24-hour-per-day language redundant, which is also a contractual construction provision that you try to give meaning, you know, specific meaning to each portion, if your position is simply, well, that's essentially reaffirming Life Group 3, then it has no true meaning. Is that allowed? I think it had no meaning. It certainly didn't have any penalty applied to it. But don't general principles of contract construction require that we ascribe meaning to the different portions of the contract? So then what does it mean? Well, so how do you pick forfeiture of economic obsolescence? Where did that come from? I mean, you could say, well, then you should, you know, have a judgment entered against you for it, or you have to go to jail for it, or something. So perhaps it's ambiguous. That takes you to extrinsic evidence. Extrinsic evidence, according to the assessor, is that the purpose was to establish a fixed schedule to give both sides clarity and certainty, and once you introduce depreciation based on obsolescence or inutility, that strips it of certainty. Look at the testimony of their witness at trial. When he said, yes, we wanted to get some certainty, that's why we applied it, no one anticipated a force majeure, and no one anticipated something changing in their expectations, and that's why we put in the force majeure provision. Once that's in, then all bets are off. Their only obligation, as we point out, their only affirmative obligation is to pay the money and to employ the people, and the force majeure prevents the county from clawing back the remedies or the tax reductions of the past. But in the settlement agreement, by agreeing that it's going to be at fair market value, Carbo gave up its tax reductions under the MOU. After 2015, it didn't claim anymore. That was a mutual thing. They will give up all of their rights under the MOU for tax reductions, but going forward, you will value us at fair market value, because it was deemed unfair where you shouldn't be able to claim obsolescence and get a tax abatement. So that was the deal. That's the settlement agreement that the court said they are bound by, that they drafted, and why does that not control? Why does that not govern? And I want to make one more point. The reason why disallowing all economic obsolescence is wrong is because of how the Supreme Court of Georgia has allowed these types of MOUs. Georgia constitution prohibits, it requires uniformity in all taxation, and because of that, counties seem to be constitutionally barred from giving incentives to companies to come into their county. Clever lawyers came up with a workaround, which is you go to the county development authority, you get them to issue bonds, which the developer both funds and buys, developers essentially borrowing money from itself, they transfer legal title to the development authority, and therefore the tax is based essentially on the lease value as opposed to the fee. But in order, taxpayers challenged this. It went to the Georgia Supreme Court that affirmed it. Would you like me to finish? No. No? Okay. I have to be fair. Thank you. Thank you, Your Honor. All right. The court will take a brief recess. Thank you.